Jesse Colorado Swanhuyser (SBN 282186)
      Email: jswanhuyser@alg.law
ANACAPA LAW GROUP, INC
508 East Haley Street
Santa Barbara, CA 93103
Tel: (805) 689-1469

Attorneys for Plaintiff
CALIFORNIA COMMUNITIES
AGAINST TOXICS

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS, a public benefit community association,<br><br>            Plaintiff,<br><br>      vs.<br><br>LU MAR INDUSTRIAL METALS CO., a California corporation; DOES 1 through 10,<br><br>            Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA COMMUNITIES AGAINST TOXICS ("CCAT" or "Plaintiff"),

a public-benefit community association, by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.      This complaint seeks relief for ongoing violations by LU MAR

INDUSTRIAL METALS CO., a California corporation ("Defendant" or "LMI"), and

DOES 1 through 10, of both substantive and procedural requirements of the Federal

COMPLAINT

1

Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "Act") and the National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ ("1997 Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively referred to herein as the "Permit" or "General Permit"), resulting from polluted stormwater and non-stormwater discharges from the industrial facility owned and operated by LMI at 2120 North Alameda Street ("Facility") in Compton, California.

2.      This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties); and 33 U.S.C. §§ 1319(d); 1365(a) (civil penalties).

3.      On June 13, 2018, Plaintiff provided notice to LMI of violations at the Facility of the Act and Permit, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California

COMPLAINT

Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of the notice letter is attached as EXHIBIT A, and is incorporated by reference.

4.     More than sixty (60) days have passed since notice was served on LMI and the State and Federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

5.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

6.     This complaint seeks relief for unlawful discharges of polluted storm water and non-storm water from the Facility in violation of the Act and Permit. Defendant's failures to comply with the discharge prohibitions, technology-based and water quality-based standards, planning, monitoring and reporting requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

7.     With every significant rainfall event millions of gallons of polluted storm water originating from industrial operations, like those conducted by Defendant, pour

into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

8.     Los Angeles' waterways are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. The waterways provide aesthetic opportunities, such as wildlife observation, and the public uses these waterways for activities such as water contact sports and non-contact recreation.

9.     Industrial facilities, like Defendant's, that discharge storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to such toxins, and harm the special aesthetic and recreational significance Los Angeles' waterways have for people in the surrounding communities.

## III.   THE PARTIES

10.     CCAT is an unincorporated public benefit community association dedicated to working with communities to advocate for environmental justice and pollution prevention for the benefit of California's human and natural communities.

11.     CCAT is a voluntary membership organization.  CCAT's by-laws provide for both organizational and individual membership.  CATT is currently composed of approximately 70 organizational members and 20 individual members.

COMPLAINT

12.    CCAT has members living in and around Compton, as well as throughout the Los Angeles River watershed. CCAT and its members are harmed by pollution that causes and threatens public health impacts, and damages the environment in and around their communities.

13.    The unlawful discharge of pollutants from the Facility into Compton Creek, the Los Angeles River and downstream water bodies impairs the ability of CCAT members to use and enjoy these waters.  Thus, the interests of CCAT and its members have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Act and Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

14.    According California's Secretary of State, LMI first registered as a corporation on April 4, 1984, and is an active California corporation.

15.    On information and belief, LMI is a privately held company with various locations in Compton. Current estimates show this company has annual revenues of approximately $13.4MM, and employs a staff of approximately 40.

16.    The Facility has three (3) Storm Water Pollution Prevention Plans ("SWPPP") on file with the Regional Board—one certified by Tony Casillas and Gabriel Garcia in June of 2015 ("2015 SWPPP"); and two un-certified, un-signed SWPPPs with revision dates of September 11, 2017 ("2017 SWPPP 1") and

September 27, 2017 ("2017 SWPPP 2").

17.     All three SWPPPs indicate that the Facility operates under Waste Discharger Identification ("WDID") No. 4 19I014846.

18.     Information available to CCAT indicates this WDID has been "active" since at least 2011.

19.     The Notice of Intent to Comply With the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") signed by Jose Vazquez on August 5, 2015 ("2015 NOI") certifies that the Facility is classified under Standard Industrial Classification ("SIC") code 5093 (Scrap and Waste Materials). While the 2015 SWPPP is silent on the matter, the two 2017 SWPPPs confirm that LMI asserts that the Facility is classified under SIC code 5093.

20.     CCAT alleges that the Facility engages in additional industrial activities classified under different, and undisclosed, SIC codes.

21.     The 2015 SWPPP indicates that the Facility covers 2 acres, and 100% of the Facility is impervious, comprised of paved surfaces or buildings. The 2015 NOI fails to indicate the size of the Facility, or the percentage of impervious surface.  2017 SWPPP 1 and 2017 SWPPP 2 indicate the Facility is approximately 4.0 acres, with 100% impervious surfaces.  LMI's website indicates the Facility is "just over 4 acres."

22.     A report filed by LMI with the Regional Board in 2017 describes the site as "a flat, rectangular parcel under 4 acres with uniform surface slopes/gradient."

23.     Information available to CCAT indicates that the Facility is at least 4

acres; that it is not entirely covered by impervious surfaces; and its slopes/gradients are not uniform.

24.     On information and belief, CCAT alleges that the Facility receives, collects, processes and distributes ferrous and non-ferrous scrap metals, construction and demolition debris, as well as hazardous and electronic waste.

25.     2017 SWPPP 2 indicates that LMI provides demolition services, as well as a broad range of on-site services to assist with construction contractors including an entire fleet of dump trucks that can handle any size project and haul away all debris and recyclable metals and materials; like, boxes and industrial containers for non-ferrous metals, demolition welding services, including shearing and torch cutting by providing cash prices for recycled metals, including the following materials: [E-grade metal (clean tin, corrugated metal); Non-ferrous (aluminum, copper, brass); Plate and structural ('I-beams' and 'H-beams,' plate); Rebar; Unprepared #1 (pipe, channel).

26.     According to 2017 SWPPP 2, industrial activities at the Facility include outdoor "C&D" crushing/grinding operations, material handling and storage, loading/unloading, non-hazardous waste storage/waste oil, and "Operational Equipment, Bailer, Machinery and Vehicles," dust and particulate generating processes, "On-Site Storage, or Disposal Scrap Metal Rolloff," "Vehicle and Equipment Fueling, Above-Ground Steel Diesel Storage Tanks, Maintenance, Cleaning Supplies Storage Shed areas," and non-storm water discharges.

27.     LMI has identified pollutants associated with industrial activities

identified in paragraphs 25 and 26 as including Total Suspended Solids, Oil & Grease, pH, (unspecified) metals, and "site specific pollutants."

28.     2017 SWPPP 1 states that no hazardous wastes or materials are accepted at the Facility.

29.     2017 SWPPP 2 states that no hazardous wastes or materials are accepted at the Facility.

30.     LMI's website indicates that hazardous wastes and materials are received and processed at the Facility.

31.     According to information available to CCAT, each of the industrial processes undertaken by LMI at the Facility, including those described above at paragraphs 25 and 26, are pollutant sources, which, pursuant to the Permit, must be disclosed and assessed for their potential contribution of pollutants in storm water discharges.

32.     CCAT's investigation indicates that pollutants associated with operations at the Facility include, but are not limited to: pH-affecting substances; metals, such as iron, aluminum, lead, zinc, cadmium, chromium, nickel, copper, manganese, and titanium; arsenic; chemical coatings; paints; total suspended solids; nitrates and nitrites; benzene; spent solvents; spent caustic sludge; hydrofluoric acid; gasoline and diesel fuels; fuel additives; coolants; antifreeze; oil and grease; and trash and debris.

33.     Many of the pollutants commonly associated with industrial activities undertaken at the Facility are on the list of chemicals published by the State of

California as known to cause cancer, birth defects, and developmental or reproductive harm.  Discharges of polluted storm water to the local surface waters pose carcinogenic and reproductive toxicity threats to CCAT's members, the public, and adversely affect aquatic ecosystems.

34.     Upon information and belief, Plaintiff alleges that the true names, or capacities, of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to CCAT, who therefore sue said Defendants by such fictitious names.  Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained.  Plaintiff's initial investigations did not establish whether LMI is associated with any other individual, corporate, associate or otherwise.

## III.   LEGAL BACKGROUND

### A.   The Clean Water Act.

35.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the Act. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to section 402, 33 U.S.C. §§ 1311(a) and 1342(b).

36.     Section 402(p), in turn, establishes the framework for regulating industrial storm water via the NPDES permit program. 33 U.S.C. § 1342(p).

37.     The Act requires all point source discharges of pollutants to waters of the

United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

38.     Section 402(b) of the Act allows each state to administer an EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.  *See* 33 U.S.C. § 1342(b).

39.     States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers.  *See* 33 U.S.C. § 1342(b).

40.     The EPA promulgated regulations for the NPDES permit program that define waters of the United States. *See* 40 C.F.R. § 122.21.

41.     EPA interprets 'waters of the United States' to include traditionally navigable waters, waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters that could affect interstate commerce and have a significant nexus to a water of the United States. 40 C.F.R. § 122.21.

42.     A significant nexus is established if the receiving waters, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters. *Rapanos v. United States,* 547 U.S. 715 (2006). A significant nexus is established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Id.* at 780.

COMPLAINT

43.    Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation…or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

44.    LMI is a "person" pursuant to the Act. *See* 33 U.S.C. § 1362(5).

45.    "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; or (b) a condition of an NPDES permit such as the General Permit. *See* 33 U.S.C. § 1365(f).

46.    Each separate violation of the Act subjects the violator to a penalty of up to $52,414 per day per violation for violations occurring after November 2, 2015; and up to $37,500 per day per violation for violations occurring prior to and including November 2, 2015.  *See* 33. U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

47.    Section 505(d) of the Act allows prevailing or substantially prevailing parties to recover litigation costs, including fees for attorneys, experts, and consultants where it finds that such an award is appropriate.  *See* 33 U.S.C. § 1365(d).

**B.    California's Stormwater Permit.**

48.    California is authorized by EPA to issue NPDES permits.  In California, the relevant NPDES permit is the General Permit, which is issued by the State Board and implemented by the Regional Board for the region in question. *See* 33 U.S.C. § 1311(a), 1342, 1362(6), (7), (12).

COMPLAINT

49.     The State Board is charged with regulating pollutants to protect California's water resources.  *See* Cal. Water Code § 13001.

50.     In order to discharge storm water lawfully, industrial dischargers in California must comply with all terms of the General Permit, or obtain and comply with an individual NPDES permit. 33 U.S.C. § 1311(a); *see also* 1997 Permit, Finding #2 *and* 2015 Permit, Section I(A) (Finding 12).

51.     Compliance with the Permit constitutes compliance with the Act for purposes of storm water discharges.  33. U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, "Permit noncompliance constitutes a violation of the Clean Water Act and [California's] Water Code."  1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

52.     The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more so, than the terms of the 1997 Permit. *See* 2015 Permit, Section I(A) (Finding 6).

53.     The Permit's annual compliance period runs from July 1 to June 30 ("Reporting Year").

54.     Compliance with the Permit requires that permittees consistently engage in a strategy with four *independent, but mutual-reinforcing* actions or steps: (1) executive planning and pollution control strategy design; (2) on-the-ground implementation of pollution control strategies; (3) monitoring stormwater discharges for evidence of pollution; and (4) annual evaluation of the effectiveness of pollution

control strategies.  The overall strategy is a feedback loop, i.e. when steps (3) and (4) indicate deficiencies in pollution control programs, the permittee must re-engage the process at step (1) to bring itself back into compliance.

      **C.**      **The Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

55.     The Permit contains a Discharge Prohibition on direct and indirect discharges of materials other than storm water ("non-storm water discharges") that are not otherwise authorized by an NPDES permit to waters of the United States. 1997 Permit, Section A(1); 2015 Permit, Section III(B).

56.     The Permit contains a Discharge Prohibition on storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code.  1997 Permit, Section A(2); 2015 Permit, Section III(C).

57.     The Permit contains a "technology-based" Effluent Limitation requiring permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  40 C.F.R. §§ 401.15-16; 1997 Permit, Section B(3); 2015 Permit, Section V(A).

58.     Compliance with this Effluent Limitation requires permittee facilities to implement effective, site-specific pollution control strategies called Best Management

Practices ("BMPs") that are designed and implemented to prevent or reduce storm water discharges *consistent with* BAT and/or BCT treatment standards.

59.    BMPs achieving BAT/BCT-level control may include structural (e.g. installation of curbs to direct storm water flows, or filters to reduce pollutant concentrations), non-structural (e.g. sweeping/washing surfaces exposed to pollutants, or equipment inspections), or a combination of structural and non-structural measures.

60.    § 304(a)(4) of the Act identified "conventional pollutants" to include Total Suspended Solids ("TSS"), Oil and Grease ("O&G) and pH. *See* 40 C.F.R. 401.16. Permittees must design BMPs for all sources of TSS, O&G and pH that meet the BCT standard; and thereafter implement, maintain and revise/adapt such BMPs so as to ensure the concentration of TSS, O&G and pH in any storm water discharge is reduced or prevented consistent with the BCT standard.

61.    Multiple metals discharged from the Facility, including but not limited to copper, chromium, cadmium, zinc and nickel, are classified as "toxic pollutants" pursuant to the Act's section 307(a)(1) at 40 C.F.R. 401.15.

62.    Permittees must design BMPs for all sources of toxic pollutants; and thereafter implement, maintain and revise/adapt such BMPs so as to ensure pollutant concentrations in any storm water discharge is reduced or prevented consistent with the BAT treatment standard.

63.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmark targets for pollutant concentrations

in storm water discharges ("Benchmarks"). *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, as modified effective May 9, 2009.

64. Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a facility achieve the statutory BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); *see also* MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

65. EPA describes the 2008 MSGP Benchmarks as "red flags" that point to a problem at the site with exposed pollutant sources or control measures that are not working correctly. *See e.g. Industrial Stormwater Monitoring and Sampling Guide* (March 2009), U.S. Environmental Protection Agency EPA 832-B-09-003.

66. The 2008 MSGP Benchmarks are based to a large degree on EPA's aquatic life criteria. *Id.*

67. Discharges from an industrial facility containing pollutant concentrations that exceed Benchmark targets indicate that the facility needs to revise its BMPs to conform to BAT/BCT statutory requirements. *Id.* The persistent discharge of stormwater containing pollutant concentrations that exceed Benchmark targets provides *prima facie* evidence that a facility has failed to develop, implement and/or revise pollution control strategies consistent with BAT/BCT standards.

68. The Permit contains certain Receiving Water Limitations intended to

protect surface waters to which pollutants are discharged.  1997 Permit, Section C(1)-(2); 2015 Permit, Section VI(A).

69.     The Facility's Receiving Water include Compton Creek, the Los Angeles River, the Los Angeles River Estuary, the Los Angeles/Long Beach Harbor, San Pedro Bay, and the Pacific Ocean (hereinafter "Receiving Waters"), all of which are waters of the United States.

70.     The Receiving Waters are an important community resource.  Although pollution and habitat destruction have drastically altered the natural ecosystem, the Receiving Waters serve essential social, environmental and economic functions.

71.     The first Receiving Water Limitation is that discharges shall not cause or contribute to an exceedance of any applicable water quality standard ("WQS").  *Id*.

72.     WQSs are numeric limits and narrative standards established by the State Board, the various regional boards, and the EPA to protect beneficial uses of the Receiving Waters.

73.     WQS applicable to discharges from the Facility include, *inter alia*, those set out in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties*[1], California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended) ("Basin Plan") and in the Criteria for Priority Toxic Pollutants for the State of

[1] *Available at* http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/.
[2] Several of the CTR limits are hardness dependent.  Defendant shall adjust the limit using the methods provided in Appendix J of the 2008 EPA Multi-Sector General Permit based on receiving water

COMPLAINT

California, a.k.a. California Toxics Rule ("CTR"). 65 Fed. Reg. 31712 (May 18, 2000); 40 C.F.R. § 131.38.

74.     Surface waters that cannot support designated beneficial uses (as listed in the Basin Plan) due to the occurrence of high levels of one or more pollutants are designated as impaired water bodies pursuant to Section 303(d). 33 U.S.C. § 1313(d).

75.     According to the 2012 303(d) List of Impaired Water Bodies, Compton Creek is impaired for copper, lead and toxicity.  Reach 2 of the Los Angeles River is impaired for, *inter alia*, copper, lead and oil.  Reach 1 of the Los Angeles River is impaired for, *inter alia*, aluminum, cadmium, copper, lead, nickel and zinc.  The Los Angeles River Estuary is impaired for, *inter alia*, chlordane, lead, sediment toxicity, and zinc.  The Los Angeles/Long Beach Inner Harbor is impaired for, *inter alia*, copper, sediment toxicity, and zinc.

76.     The Basin Plan includes narrative and numeric WQSs for inland surface waters and enclosed bays and estuaries for, among other things: chemical constituents, toxic substances, pH, oil & grease, suspended or settleable matter, and floating materials.

77.     The existing and/or potential Beneficial Uses for Compton Creek include groundwater recharge; water contact recreation; non-contact water recreation; warm freshwater habitat; and wildlife habitat. Basin Plan, Table 2-1.

78.     The existing and/or potential Beneficial Uses for downstream of the point at which the Los Angeles River receives storm water discharges from the Facility (i.e.,

Los Angeles River Reaches 1 and 2, the Los Angeles River Estuary, Los Angeles Harbor, and San Pedro Bay) include, among others, municipal and domestic supply; groundwater recharge; water contact recreation; non-contact water recreation; warm freshwater habitat; wildlife habitat; wetland habitat; marine habitat, estuarine habitat; rare, threatened, or endangered species; migration of aquatic organisms; spawning, reproduction, and/or early development; commercial and sport fishing, and shellfish harvesting. Basin Plan, Table 2-1.

79.   EPA promulgated the CTR based on a determination that the numeric criteria were necessary to protect human health and the environment.

80.    The CTR "criteria apply throughout the water body including at the point of discharge into the water body."  65 Fed. Reg. 31712 paragraph (c)(2)(i).

81.   The Permit's second Receiving Water Limitation is that storm water discharges shall not adversely impact human health or the environment. 1997 Permit, Section C(1); 2015 Permit, Section VI(B).

82.   The third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. *See* 2015 Permit, Section VI(C).

83.   Thus, discharges with pollutant levels in excess of the Basin Plan standards, CTR criteria, and/or other applicable WQSs are violations of the Permit's Receiving Water Limitations.

84.   U.S. EPA has established Total Maximum Daily Load ("TMDL")

regulations applicable to the Los Angeles River, which were subsequently incorporated into the Basin Plan via amendment by Resolution No. R13-004.

85.   The regulatory mechanism used to implement the TMDL wasteload allocations assigned to point sources, including the Facility, is the General Permit.

86.   Use of the Receiving Waters by CCAT members and public for water contact sports and fishing exposes many people to toxic metals, pathogens, bacteria and other contaminants in storm water and non-storm water discharges.  Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also harmed by polluted discharges to the Receiving Waters.

87.   Numeric WQS applicable to the Facility include, but may not be limited to, those detailed in TABLE 1.

**TABLE 1**
WATER QUALITY STANDARDS APPLICABLE TO THE FACILITY[2]

| PARAMETER | SOURCE | NUMERIC LIMIT |
|---|---|---|
| pH | Basin Plan | 6.5-8.5 s.u. |
| Al | Basin Plan | 1.0 mg/L |
| Cu | CTR | 0.013 mg/L (CMC) |
| Zn | CTR | 0.120 mg/L (CMC) |
| Pb | CTR | 0.065 mg/L (CMC) |
| Ni | CTR | 0.470 mg/L (CMC) |
| Cr | Basin Plan | 0.016 mg/L (CMC) |
| Arsenic | CTR | 0.34 mg/L (CMC) |

[2] Several of the CTR limits are hardness dependent.  Defendant shall adjust the limit using the methods provided in Appendix J of the 2008 EPA Multi-Sector General Permit based on receiving water sampling hardness data as applicable.

COMPLAINT

19

### D.    The Permit's Pollution Prevention Plan Requirements.

88.    Permittees must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Sections A(1)(a), E(2); 2015 Permit, Sections I(I) (Finding 54), X(B).

89.    The SWPPP must include, *inter alia*: i) a narrative description and summary of all industrial activity, potential sources of pollution, and pollutants associated with each potential source; ii) a description of dust and particulate generating activities; iii) a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; iv) a description of storm water management practices; v) a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; vi) the identification and elimination of non-storm water discharges; vii) the identification and location where materials are being shipped, received, stored, handled, as well as typical quantities of such materials and the frequency with which they are handled; and viii) a description of persons and their current responsibility for developing and implementing the SWPPP. 1997 Permit, Sections A(1)-(10); 2015 Permit, Section X.

90.    The 2015 Permit requires certain SWPPP enhancements, including a more comprehensive assessment of potential pollutant sources, and more specific descriptions of BMPs to be implemented.  *See* 2015 Permit Sections X(G)(2), (4), (5).

91.     The objectives of the SWPPP are to: i) identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges; and ii) to identify and describe site-specific BMPs to reduce or prevent the discharge of polluted storm water from industrial facilities.  1997 Permit, Section A(2); 2015 Permit, Section X.

92.     The most important element of any SWPPP prepared pursuant to a *general* permit is the description of each industrial process occurring at the facility, the evaluation of sources of pollution associated with industrial activities, and the identification of pollutants that may affect the quality of stormwater ("Source Evaluation and Pollutant Assessment").  1997 Permit, Section A(2); 2015 Permit, Sections X(C), (F), (G).

93.     According to information available to CCAT, each of the industrial processes/services undertaken at the Facility and described in paragraphs 25 and 26 are pollutant sources that must be described and assessed for their potential contribution of pollutants in storm water discharges by LMI as part of the Facility's Source Evaluation and Pollutant Assessment.

94.     The SWPPP must describe, and permittees must then implement, site-specific BMPs tailored to the findings and conclusions of the Source Evaluation and Pollutant Assessment.  As described above, BMPs must meet BAT/BCT treatment standards, and prevent stormwater discharges with pollutant concentrations exceeding applicable WQSs. 1997 Permit, Section A(2); 2015 Permit, Sections I(D) (Finding

COMPLAINT

21

32), X(C), X(H), XXI(A).

95.     The SWPPP must be evaluated, and revised as necessary, *at least* annually to ensure ongoing compliance.  *See* 1997 Permit Sections A(9)-(10); *see also* 2015 Permit § X(B).

96.     Failures to develop, implement, or revise an adequate SWPPP constitutes Permit noncompliance. 1997 Permit, Section B(4)(c), 2015 Permit, Section X(B).

97.     The Permit requires permittees to complete an Annual Comprehensive Site Compliance Evaluation ("Compliance Evaluation").  The Compliance Evaluation must include: a review of all visual observation records, inspection reports and sampling analysis data; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; an evaluation of each BMP to determine whether it is objectively adequate in light of M&RP data; an assessment of BMP design and implementation effectiveness; a determination regarding whether additional BMPs are needed to comply with the Permit; and a visual inspection of equipment needed to implement the SWPPP.  1997 Permit, Section A(9); 2015 Permit, Section XV.

98.     Section A(9)(d) of the 1997 Permit requires permittee's submit an annual Compliance Evaluation that includes an identification of personnel performing the evaluation, date(s) of the evaluation(s) necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the permittee is in compliance with the Permit.

1997 Permit; Section A(9)(d)(i)-(vi).  If certification cannot be provided, the permittee

must explain in the Compliance Evaluation why the facility is not in compliance

and/or report any anticipated noncompliance.  1997 Permit, Section A(9)(d); 2015

Permit, Section XXI(M).

### E.    The Permit's Monitoring and Reporting Requirements.

99.    The 1997 Permit required permittees to develop a monitoring and

reporting program ("M&RP") along with its SWPPP, and then implement the M&RP

as soon as industrial activities began. 1997 Permit, Sections B(1)-(4), E(3).  The 2015

Permit contain virtually identical M&RP requirements.  2015 Permit, Sections X(I)

and XI.

100.    The general objective of the M&RP is to assess Permit compliance.

Specifically, the M&RP must be designed and implemented to evaluate the

effectiveness of BMP design and implementation.  Information derived from the

M&RP informs each permittee as to whether it must adapt BMP design or

implementation to ensure that storm water and non-storm water discharges are in

compliance with the Permit (i.e. Discharge Prohibitions, Effluent Limitations, and/or

Receiving Water Limitations).  *See* 1997 Permit, Section B(2); *see also* 2015 Permit,

Sections X(I) and XI.

101.    The M&RP must include monthly visual observations of storm water

discharges, and the documentation of the presence of pollutants.  1997 Permit, Section

B(4)(a); 2015 Permit, Section XI(A).  Permittees are required to take corrective action

to reduce or prevent pollutants from contacting storm water discharges as indicated by observations. 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3).

102.   The Permit requires permittees to collect storm water samples from each location where storm water is discharged.  1997 Permit, Sections B(5), (7); 2015 Permit, Section XI(B)(4).  Section B(5)(a) of the 1997 Permit required permittees to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season (defined as October 1 to March 30) and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season, and must explain in the Annual Report why the first storm event was not sampled.

103.   Section XI(B)(2) of the 2015 Permit requires permittees to collect and analyze storm water samples from two (2) Qualifying Storm Events ("QSE") within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).  The 2015 Permit requires permittees to submit all sampling and analytical results for all samples via SMARTS within thirty (30) days of obtaining all results for each sampling event.

104.   Permittees must analyze each sample for as many as five classes of pollutants, including: 1) Basic Parameters, which are pH, TSS and either total organic carbon ("TOC") or O&G (1997 Permit, Section B(5)(c)(i); 2015 Permit, Sections

XI(B)(6)(a)-(b)); 2) Facility-Specific Parameters, which are site-specific pollutants identified in the Source Evaluation and Pollutant Assessment (1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(c)); 3) Receiving Water Parameters, which are industrial pollutants related to receiving waters with 303(d) listed impairments, or an approved TMDL (1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(e)); 4) Standard Industrial Classification ("SIC") Code-Based Parameters, which are pollutants common to discharges from particular industrial activities listed in the Permit (*See e.g.* 2015 Permit, Section XI(b)(6)(d)); and 5) Board-Mandated Parameters, which are any additional pollutants identified by the relevant Regional Water Board (*See e.g.* 2015 Permit, Section XI(b)(6)(f)).

105.   Section B(14) of the 1997 Permit required that permittees submit an Annual Report to the applicable Regional Board by July 1 of each year, which must include, *inter alia*, all records collected per the M&RP and the Compliance Evaluation.  The 2015 Permit contains substantially identical requirements.

106.   Section XVI of the 2015 Permit requires permittees to submit a Compliance Checklist with each Annual Report that: i) indicates whether the permittee complies with, and has addressed all applicable requirements of the 2015 Permit; ii) an explanation for any noncompliance of requirements within the reporting year, as indicated in the Compliance Checklist; and iii) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, the date(s) of the annual Compliance Evaluation.  Most importantly,

1
2

the Annual Report must outline BMP revisions or additions, if any, that are necessary

for the permittee to comply with the Permit and Act.

3
4

## V.   STATEMENT OF FACTS

5
6
7
8

107.   LMI owns and operates the Facility, which has been and continues to be

enrolled in the Permit for at least the last 5 years.

108.   According to multiple filings certified by LMI, the Facility's primary

9

SIC code is 5093.  LMI has not disclosed additional SIC codes applicable to the

10
11

Facility.

12
13

109.   The Facility is approximately 2.0 miles east of Compton Creek, and

approximately 3.0 miles west of the Los Angeles River.

14
15
16

110.   LMI has variously reported that the Facility has as few as 1 and as many

as 3 discharge points.

17
18
19

111.   Information available to CCAT indicates that the Facility has *at least* 6

discharge points, some of which have never been disclosed per the Permit.

20
21
22
23
24
25
26
27

112.   On information and belief, Plaintiff alleges that all industrial activities

performed at the Facility, including those described in or associated with activities

detailed in paragraphs 25 and 26 above, are potential sources of water contamination,

and that the vast majority of storm water discharges from the Facility contain storm

water that is commingled with runoff from areas at the Facility where industrial

processes occur and where industrial pollutants are found.

28

113.   CCAT is informed and believes, and thereupon alleges that storm water

COMPLAINT

flowing over the Facility collects suspended sediment, dirt, metals, and other pollutants, which are discharged to the Receiving Waters.

114.   On information and belief, Plaintiff alleges that the management practices at the Facility do not prevent the sources of water contamination from causing the discharge of pollutants to waters of the United States.

115.   After a thorough review of all documents publicly available, CCAT alleges that LMI has not collected or analyzed a single sample of storm water at the Facility in the last 5 years.

116.   Based on an assessment of publicly available information, as well as its own reconnaissance visits to the Facility, CCAT alleges that LMI has and continues to violate the Permit and Act's public health and environmental protection mandates, including but not limited to the Permit's discharge prohibitions, technology-based effluent limitations, and water quality-based receiving water limitations.

117.   On information and belief, and its review of the Facility's SWPPP's described above at paragraph 16, the Sample Location Outfall #1 Elimination Technical Report prepared by Arthar Khan, Ph.D on October 3, 2017 ("Khan Report"), and other publicly available records, CCAT alleges that LMI has failed, and continues to fail, to prepare, implement, review and revise a legally adequate SWPPP, which constitutes an independent, daily and ongoing violation of the General Permit.

118.   On information and belief, CCAT alleges that the 2015 SWPPP, the 2017 SWPPP 1 and the 2017 SWPPP 2 do not contain a legally adequate Source Evaluation

and Pollutant Assessment (*see e.g.* 2015 Permit §§ X(F), (G)), lack legally adequate BMPs and BMP descriptions (*see e.g.* 2015 Permit § X(H), do not contain a legally adequate M&RP (see e.g. 2015 Permit §§ X(I) and XI), and the Site Maps fail to meet Permit requirements.

119.   On information and belief, Plaintiff alleges that LMI has failed to effectively implement BMPs described in (or included by reference) its SWPPPs and other compliance documents, including but not limited to BMPs described in the Khan Report.

120.   The general inadequacy of BMPs at the Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and M&RP for the Facility.

121.   On information and belief, Plaintiff alleges that LMI has failed and continues to fail to implement an adequate M&RP, most specifically a failure to collect a sufficient number of storm water samples, failure to collect samples from each discharge point, and failure to analyze collected samples for all pollutants required by the Permit.

122.   On information and belief, Plaintiff alleges that LMI has failed to complete a legally adequate Compliance Evaluation in any of the last 5 years.

123.   On information and belief, Plaintiff alleges that LMI has submitted Annual Reports and other compliance documents over at least the last five years that contain numerous, material errors and omissions, including false information and false

COMPLAINT

certifications, that constitute intentional or negligent violations of the Act and Permit.

124.   Errors and omissions referred to in paragraph 123 above include, but are limited to, the following: failures in 2013 and 2014 to lawfully complete essential portions of annual reports; disclosing conflicting information about the number and location of discharge points, failing to collect and analyze storm water samples, failing to complete observations required by the Permit, falsely certifying that certain pollutants are not present at the Facility, falsely claiming that there were no or insufficient rain events to comply with the Permit's monitoring mandate, and most importantly, failing to complete Annual Compliance Evaluations and then implement remedial action in response to its own reviews and notices of non-compliance from the Regional Board.

## VI.        CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in
Violation of the Permit's Effluent Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

125.   CCAT re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

126.   CCAT is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities through the implementation of BMPs at the Facility that achieve BAT/BCT treatment standards.

COMPLAINT

127.   CCAT is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT-level control from the Facility occur every time storm water is discharged. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Permit and the Act. *See* 1997 Permit, Section B(3); *see also* 2015 Permit, Sections I(D) (Finding 32), V(A); *see also* 33 U.S.C. § 1311(b).

128.   Defendant violates and will continue to violate the Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

129.   Each and every violation of the Permit's Effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

130.   Defendants' violations of the Permit's Effluent Limitations and the Act are ongoing and continuous.

131.   By committing the acts and omissions alleged above, LMI is subject to an assessment of civil penalties for each and every violation of the Act occurring from June 13, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

132.   An action for injunctive relief is authorized by section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which

COMPLAINT

harm CCAT has no plain, speedy, or adequate remedy at law.

133.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### SECOND CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in
Violation of the Permit's Receiving Water Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

134.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

135.   CCAT is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

136.   CCAT is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has been discharged and continues to be discharged from the Facility each time stormwater is discharged from the Facility.

137.   Plaintiff is informed and believes, and thereupon alleges, that since at least June 13, 2013, Defendant has discharged polluted storm water from the Facility

causing or contributing to the violation of the applicable WQS, and adversely impacting human health or the environment in violation of the Permit's Receiving Water Limitations.

138.   Every day, since at least June 13, 2013, that Defendant has discharged polluted storm water from the Facility in violation of the Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

139.   Each and every violation of the Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C. § 1311(a).

140.   By committing the acts and omissions alleged above, LMI is subject to an assessment of civil penalties for each and every violation of the Act occurring from June 13, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

141.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which CCAT has no plain, speedy, or adequate remedy at law.

142.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

COMPLAINT

**THIRD CAUSE OF ACTION**
**Defendant's Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

143.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

144.   Plaintiff is informed and believes, and thereupon alleges, that Defendant has not developed and implemented a legally adequate SWPPP for the Facility.

145.   Each day since June 13, 2013, that Defendant has not developed, implemented and updated a legally adequate SWPPP for the Facility is a separate and distinct violation of the Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

146.   Defendant has been in violation of the SWPPP requirements every day since June 13, 2013.  Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

147.   By committing the acts and omissions alleged above, LMI is subject to an assessment of civil penalties for each and every violation of the Act occurring from June 13, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

148.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm CCAT has no plain, speedy, or adequate remedy at law.

COMPLAINT

149.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Defendant's Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

150.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

151.   Plaintiff is informed and believes, and thereupon alleges, Defendant has not developed and implemented a legally adequate monitoring and reporting program for the Facility.

152.   Each day since June 13, 2013, that Defendant has not developed and implemented an adequate monitoring and reporting program for the Facility in violation of the Permit is a separate and distinct violation of the Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite collection/ monitoring and analytical results is ongoing and continuous.

153.   By committing the acts and omissions alleged above, LMI is subject to an assessment of civil penalties for each and every violation of the Act occurring from June 13, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33

34

U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

154.   An action for injunctive relief is authorized by Act section 505(a),

33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm Plaintiff and the citizens of the State of California, for which

harm CCAT has no plain, speedy, or adequate remedy at law.

155.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

because an actual controversy exists as to the rights and other legal relations of the

Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth

hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Accurately Certify Compliance
in Annual Reports in Violation of the Permit and the Act
(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

156.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if

fully set forth herein.

157.   Defendant has not accurately certified compliance with the Permit in

each of its annual reports submitted since at least June 13, 2013.

158.   Each day since at least June 13, 2013, that Defendant does not accurately

certify compliance with the General Permit is a separate and distinct violation of the

Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be

in violation of the General Permit's certification requirement each day it maintains an

inaccurate certification of compliance with the General Permit.

159.     By committing the acts and omissions alleged above, LMI is subject to an assessment of civil penalties for each and every violation of the Act occurring from June 13, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

160.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm CCAT has no plain, speedy, or adequate remedy at law.

161.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated, and to be in violation of, the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility except as authorized by the Permit;

COMPLAINT

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the Permit;

d.  Order Defendant to immediately implement storm water pollution control technologies and measures that are equivalent to BAT or BCT, and that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.  Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.  Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since June 13, 2013, up to and including November 2, 2015, and up to $52,414 for violations occurring after November 2, 2015 pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

COMPLAINT

j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.   Award any such other and further relief deemed appropriate by the Court.

DATED: August 14, 2018          Respectfully submitted,

By:    /s/ Jesse C. Swanhuyser
       Jesse C. Swanhuyser
       **Attorney for Plaintiff**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

1